### IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

IN RE:  TODD ARMSTRONG,                                   Case No. 4:23-bk-10939
                                                          (Chapter 13)
                    **Debtor.**

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the *Objection to Proof of Claim #4 filed by Hayley Keeton* (the "**Objection**") (Doc. No. 25), filed on behalf of Todd Armstrong (the "**Debtor**"), on October 2, 2023, along with the *Response to Objection to Proof of Claim #4 filed by Hayley Keeton* (the "**Response**") (Doc. No. 33), filed on behalf of Hayley Keeton ("**Ms. Keeton**"), on November 1, 2023.  A hearing was held on the Objection and Response on December 19, 2023.  Kevin P. Keech of the Keech Law Firm, PA appeared on behalf of the Debtor, who also appeared in person.  Sydney Rasch of Turner, Rasch, & Martin, LLP appeared on behalf of Ms. Keeton, who also appeared in person.  Also appearing to testify on behalf of Ms. Keeton was Tammy Gattis ("**Ms. Gattis**"), an attorney with the Owings Law Firm who represented Ms. Keeton in the state court domestic relations action at issue in this proceeding.

Ms. Keeton filed a proof of claim in this case in the amount of $72,002.11 (the "**Claim**") and classified the Claim as a domestic support obligation entitled to priority under 11 U.S.C. § 507(a).  The issue before the Court is whether the Claim, which primarily arose from judgments entered against the Debtor in favor of Ms. Keeton for attorney's fees and costs awarded in the former spouses' state court domestic relations case, is a domestic support obligation entitled to priority status under 11 U.S.C. § 507(a) or if the Claim should instead be treated as a general unsecured claim.

For the reasons stated below, the Court finds that the Objection is sustained in part and overruled in part.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

## II. FACTS

Ms. Keeton and the Debtor were married on May 1, 1999, and three children were born of their marriage.  Ms. Keeton is a public-school teacher, and the Debtor is a realtor.  The parties sold their home on Imperial Valley Drive in Little Rock, Arkansas, in order to purchase a new home and reduce credit card debt owed by Ms. Keeton.  The new home located on Montvale Drive in Little Rock, Arkansas (the "**Montvale Property**"), was purchased on April 24, 2018.  Ms. Keeton was obligated on the note for the Montvale Property, but the Debtor was not.  The day after the Montvale Property was purchased, the Debtor initiated a domestic relations action seeking a divorce against Ms. Keeton (the "**Divorce Action**").[1]

### A. Divorce Action

At the time the Divorce Action was filed, all three children of the marriage were minors.  Prior to the filing of the Divorce Action, Ms. Keeton was unaware that the Debtor did not intend to move into the Montvale Property with her and their three children.  Ms. Keeton, represented by Ms. Gattis of the Owings Law Firm, filed a counterclaim against the Debtor seeking child

---

[1] Case No. 60DR-2018-1532 filed in the Pulaski County Circuit Court, 17th Division, Pulaski County, Arkansas, Hon. Mackie Pierce presiding.

support and alimony.  From the evidence introduced at the hearing, it is clear that the Divorce

Action was very acrimonious.  As will be further explained below, Ms. Keeton was ultimately

awarded judgments for attorney's fees and costs in connection with the Divorce Action.  The

judgments are defined as Awards 1 through 5 below.  Each will be discussed in detail.

### (1)  Awards 1 and 2 - $153.00 and $1,099.29, respectively

On June 4, 2018, Ms. Keeton filed for an ex-parte order of protection on behalf of herself

and her three minor children.  Following a hearing on June 25, 2018, the state court entered a

final order of protection, and the Debtor "was barred from the home and workplace of

[Ms. Keeton]."  (Debtor's Ex. 5, ¶ 7).  The Debtor appealed, and the Arkansas Court of Appeals

affirmed the state court's decision.  Ms. Keeton was awarded a judgment against the Debtor in

the amount of $153.00 for the brief costs on the appeal ("**Award 1**").  She was also awarded a

judgment against the Debtor in the amount of $1,031.25 in attorney's fees and $68.04 in costs,

for a total of $1,099.29, in connection with the appeal ("**Award 2**").  Both judgment awards were

entered in April of 2019.

### (2)  Award 3 - $60,269.72

As will be further explained below, Ms. Keeton was the prevailing party in the Divorce

Action, and the state court gave Ms. Keeton permission to petition for an award of attorney's

fees and costs incurred in the matter.  Ms. Keeton's attorneys filed a motion seeking over

$103,000.00 in attorney's fees and costs.  The state court ultimately awarded Ms. Keeton

$50,000.00 in attorney's fees and $10,269.72 in costs, for a total award of $60,269.72

("**Award 3**").  The events leading up to this award are as follows.

(a) *The Temporary Order on Custody*

On June 25, 2018, shortly after the Divorce Action began, a hearing was held on Ms. Keeton's request for a temporary hearing, and a temporary order (the "**Temporary Order**") was entered on October 22, 2018, awarding Ms. Keeton "legal and physical custody" of the three minor children on a temporary basis. (Creditor's Ex. 3, ¶ 3). According to the Temporary Order, the basis for the custody decision was that the Debtor "acted inappropriately" in refusing to inform Ms. Keeton where the children were staying when they were in his physical custody, and joint custody was "not an option" because "the parties [were] not getting along." (Creditor's Ex. 3, ¶ 3). The Temporary Order also found the Debtor's conduct towards the children in having "the children kneeling against the wall on hardwood floors to be borderline abuse." (Creditor's Ex. 3, ¶ 4).

In the Temporary Order, the state court also ruled, in pertinent part, as follows:

> The Court finds that just because [Ms. Keeton] qualified for a mortgage on the marital home does not mean she can afford the house payment. The Court further finds the [Debtor] used his professional knowledge as a realtor to arrange for [Ms. Keeton] to be responsible for a mortgage she cannot afford and then immediately, the next day, told [Ms. Keeton] he was filing for divorce. The [Debtor] shall be responsible for the mortgage payment each month beginning with the month of July, 2018. The parties have agreed subsequent to the hearing that the [Debtor] will bring the $1,843.00 mortgage payment to his attorney's office by the first of each month beginning July 1, 2018 and [Ms. Keeton] or her counsel will pick up the payment and make the house payment when it is due.
>
> ****
>
> Following the June 25, 2018 hearing, the parties were unable to reach an agreement on child support. However, the Court ruled subsequent to said hearing that . . . the [Debtor] continue to pay the mortgage on the home where the children and [Ms. Keeton] are residing on a temporary basis in the amount of $1,843.00, [Ms. Keeton's] car payment on her Toyota Forerunner in the amount of $670.00 and the car insurance on the Toyota Forerunner that [Ms. Keeton] is driving. Due to the amount the [Debtor] is paying for these items, the Court will not Order child support to be paid on

4

a temporary basis since [the Debtor's] financial support for [Ms. Keeton] exceeds the chart amount of child support that would be owed by him to her.

(Creditor's Ex. 3, ¶¶ 6, 12).  The Debtor was to pay the mortgage payment of $1,843.00 per month on the marital home, the Toyota 4Runner payment of $670.00 per month, and insurance on the 4Runner "in lieu of child support."  (Debtor's Ex. 5, ¶ 8).

During the Divorce Action, Ms. Keeton filed several motions for contempt against the Debtor for the Debtor failing to timely make the mortgage payments, for the Debtor "unilaterally deducting money from the mortgage payment amount," for the Debtor terminating Ms. Keeton's cell phone service, and for the Debtor allegedly changing their son's medication routine without informing Ms. Keeton.  (Debtor's Ex. 5, ¶ 9).  In the Decree of Absolute Divorce entered in the Divorce Action on August 13, 2019 (the "**Decree**"), the state court summarized the outcome of these motions, finding:

> [The Debtor] has clearly violated the court's Temporary Order and the standing Restraining Order.  [The Debtor's] temper resulted in his being fired from his previous employer, Jon Underhill.  [The Debtor] is guilty as alleged of failing to pay the monthly mortgage payment in a timely manner, terminating [Ms. Keeton's] cell phone service and deleting her stored cell phone data, unilaterally changing K.A.'s medication without notifying or discussing same with [Ms. Keeton], deducting monies owed for the monthly mortgage, and violating the standing Restraining Order in this case by selling marital personal property without agreement of [Ms. Keeton] or authorization from this court.  [The Debtor] is found to be in willful contempt of this court's Temporary Order and standing Restraining Order.

(Debtor's Ex. 5, ¶ 10).

### (b) *The Final Hearing on Divorce and Divorce Decree*

The final hearing on the divorce was held over four days, April 30 through May 3, 2019, at which time the state court decided to impute income to the Debtor for the purpose of determining child support, finding:

Any reduction in [the Debtor's] income as a Realtor is due to [the Debtor's] actions or inaction, i.e., working below ability or without diligence. [The Debtor's] testimony in this regard was not credible. [The Debtor] misstated his earnings from Jon Underhill in 2018. [The Debtor] has not filed a tax return for 2018. [The Debtor] can earn more than what he has earned since the filing of this divorce action, not only as a Realtor but with his father in private business endeavors. The court will impute income to [the Debtor].

(Debtor's Ex. 5, ¶ 12). The state court then reviewed the Debtor's financial records and made the following findings:

In reviewing the financials provided by [the Debtor], specifically his 2016 and 2017 income tax returns, considering the bank account records provided for [the Debtor], and considering the testimony of the parties and witnesses, the court finds the [Debtor] has an ability to earn $120,000.00 per year gross income. The court will give [the Debtor] credit for state, federal, and FICA taxes totaling 30% of gross leaving a net income of $84,000.00 per year, or a monthly net of $7,000.00. Child support will be set at $1,636.00 per month for three children commencing September 1, 2019, and continuing each month thereafter until further order of this court.

(Debtor's Ex. 5, ¶ 13).

In addition to imputing income to the Debtor and establishing the amount of child support to be paid by the Debtor, the state court also addressed the Debtor's disposition of marital property without court authority. Specifically, the court found:

[The Debtor] has violated the court's Restraining Order by selling or disposing of a 2008 Moomba boat and trailer, 19 guns and gun safe, 2003 Suzuki ATV, 2009 R&W Rice trailer, and a 1996 Toyota Land Cruiser. The court finds [the Debtor] to have sold some of these items below market value and some of the sales were not arms-length transactions. [The Debtor] stated he received a total of $38,000.00 from the sale of these items. None of the sales proceeds were provided [to Ms. Keeton], nor was [Ms. Keeton] advised prior to any of the sales of these items of marital property. Clearly [the Debtor] did not seek court permission for the sale of these items. As a result of this conduct, [the Debtor] is again in willful violation of this court's order. As partial punishment, [Ms. Keeton] will be awarded her entire interest in her Little Rock School District retirement account. (This award to [Ms. Keeton] is also in part compensation for the $20,000.00 sale of a Freightliner truck sold by [the Debtor] and his father where title was in [the Debtor's] name and assessed in [the Debtor's] name as personal property

6

owned by [the Debtor]). [Ms. Keeton] is also awarded any and all funds in
the Regions Bank joint account.

(Debtor's Ex. 5, ¶ 20).

Ms. Keeton was also awarded the Montvale Property in the Divorce Action. The state

court found:

> [The Debtor], in lieu of child support and temporary alimony, has been
> obligated to pay the mortgage on the Montvale property pursuant to the
> temporary order. He has paid, but not without some problem and delays.
> He is in contempt for his willful failure to pay in full and timely.
> [Ms. Keeton] will be awarded the home on Montvale, free of any claim of
> [the Debtor], based upon [the Debtor's] actions in this case, specifically his
> contemptible conduct in failing to pay the mortgage as ordered as well as
> his violation of the restraining order against selling, conveying or
> transferring his interest in marital property. [Ms. Keeton] will commence
> paying the mortgage on the Montvale property with the September, 2019,
> mortgage payment. [The Debtor] will execute a Quitclaim Deed in favor of
> [Ms. Keeton] for any interest he may have in the Montvale property
> immediately upon being presented with same.

(Debtor's Ex. 5, ¶ 19).

The Debtor was also ordered to make the payments on the 2016 4Runner awarded to

Ms. Keeton as a rehabilitative alimony award. The Decree provided for this payment as follows:

> [Ms. Keeton] will be awarded ownership of her 2016 Toyota 4Runner SUV.
> [The Debtor] will be responsible for any indebtedness owed on the 2016
> Toyota 4Runner until it is paid in full. . . . Each party will pay their own
> insurance and personal property taxes for their vehicle. Upon payment in
> full of the debt owed on the 2016 4Runner, [the Debtor] will transfer title to
> that vehicle to [Ms. Keeton]. The payments to be made by [the Debtor]
> toward satisfaction of the 4Runner debt are in the nature of alimony. [The
> Debtor] has the ability to pay this debt and [Ms. Keeton] has the need. The
> court has considered all the factors in any award of alimony and finds this
> award of rehabilitative alimony to be appropriate.

(Debtor's Ex. 5, ¶ 21).

Finally, the Decree also provided that "[a]s the prevailing party, [Ms. Keeton] may petition this court for an award of attorney fees and cost in this matter.  [The Debtor] may file the appropriate response to any such request."  (Debtor's Ex. 5, ¶ 26).

### (c)  *Motion for Attorney's Fees and Costs*

Ms. Keeton's attorneys, Owings Law Firm, filed a motion for attorney's fees and costs on August 27, 2019.  The request for attorney's fees covered services provided from May 31, 2018, through August 22, 2019.

This fee request was categorized into services and expenses incurred for particular matters, as follows:

| | |
|---|---|
| $ 1,661.25 | First contempt motion and amended contempt motion |
| $ 2,603.25 | Second contempt motion and request for body attachment |
| $ 3,087.25 | Third contempt motion and amended contempt motion |
| $ 1,189.00 | Fourth contempt motion |
| $ 9,541.48 | Discovery inadequacies |
| $ 2,963.28[2] | General discovery |
| $53,806.50 | Court and trial preparation/preparation of orders |
| $18,110.35 | General client and lawyer correspondence/draft of documents |
| $ 6,967.54 | Reimbursable expenses associated with case preparation and litigation |
| $ 3,633.45 | Depositions of parties and witnesses with associated costs |

(Creditor's Ex. 2, ¶ 9).  The total amount requested was $93,293.63 in fees and $10,269.72 in expenses for a total amount of $103,563.35.

---

[2] This amount is shown on Exhibit 1 to the motion for attorney's fees and costs submitted to the state court. (Creditor's Ex. 2).

Ms. Gattis testified about the different components of the fee request.[3]  As stated earlier, Ms. Keeton was awarded custody of the three minor children, and the Debtor was ordered to pay, among other things, the mortgage on the Montvale Property and the car payment on the Toyota 4Runner in lieu of child support.  The first motion for contempt was filed because the Debtor failed to pay Ms. Keeton's mortgage payment and had her cell phone service cancelled.  The first motion for contempt was amended after the Debtor failed to pay three additional mortgage payments.

The second motion for contempt and the motion for body attachment were filed because the Debtor again failed to pay Ms. Keeton's mortgage payment.  At the time the second motion for contempt was filed, the Debtor had missed three additional mortgage payments.

The third motion for contempt was filed after the Debtor "unilaterally reduced the mortgage payment," failed to pay "his half of his children's medical bills," and took one of the children out of school without authority to do so.  (Tr. at 160).

The fourth motion for contempt was filed after the Debtor sold marital property without court authority to do so and retained the sale proceeds for himself.  The Debtor's sale of marital assets without court authority was part of the basis for the state court awarding Ms. Keeton her retirement account in the Divorce Action.  According to Ms. Gattis, the sale proceeds "generated income that [the Debtor] did not report."  (Tr. at 178).

The next two categories of attorney's fees and costs related to discovery issues in the Divorce Action.  According to Ms. Gattis, the Debtor was not responsive to requests for information, and she filed a motion to compel the Debtor to respond to discovery.  In addition,

---

[3] In addition to Ms. Gattis's testimony regarding the attorney's fees and costs requested, Ms. Keeton introduced the motion for attorney's fees and costs filed in the Divorce Action by Ms. Gattis on August 27, 2019.  The itemized entries attached to the motion corroborate Ms. Gattis's testimony regarding these fees and costs.

she issued twenty-nine subpoenas to gather information regarding assets and income for calculating child support and alimony.  She testified that the subpoenas were necessary to obtain truthful information about the Debtor's assets and income because the Debtor was not forthcoming in producing this information.  Ms. Gattis testified that the state court looked at the 2016 and 2017 tax returns and the subpoenaed documents "to determine [the Debtor's] income to impute his income."  (Tr. at 135).  When asked on cross examination if the subpoenas relate to the determination of income or to the division of assets, Ms. Gattis responded that the subpoenas were issued because they were "looking for bank accounts, but most of it went towards looking for income for purposes of setting child support and alimony."  (Tr. at 150).

For example, Ms. Gattis issued a subpoena to a person she described as a "former partner of sorts" of the Debtor who was "flipping" houses with the Debtor.  (Tr. at 125).  Ms. Gattis testified this subpoena was issued to determine the Debtor's income from house flipping.  In addition, subpoenas were issued to financial institutions and former employers of the Debtor.  The financial institutions were subpoenaed to locate possible assets and then to determine the source of the funds in the accounts.  Former employers were subpoenaed to determine the Debtor's income.

As to the category for court and trial preparation and preparation of orders, Ms. Gattis testified that there were eight or nine court hearings all "related to either [the Debtor's] nonpayment of support, or his failure to provide discovery, or the final hearing regarding his income and what that was."  (Tr. at 131).

As to the fees incurred for general client and lawyer correspondence and drafting documents, Ms. Gattis explained that these are fees associated with general correspondence and general drafting of everything else in the Divorce Action, except for the motions for contempt.

She further explained that the reimbursable expenses associated with case preparation and litigation were general expenses, copies, and fees associated with the subpoenas.

Finally, the fees and costs for depositions of parties and witnesses were, according to Ms. Gattis, for depositions issued to "ascertain [the Debtor's] income."  (Tr. at 179).

*(d) Order Awarding Fees and Costs*

On November 19, 2019, the state court entered an order on the fee request, finding, in pertinent part, as follows:

1. [Ms. Keeton] was the prevailing party in this divorce case.  The court heard four days of testimony and considered voluminous exhibits in making its determination of the issues.

2. This case was not exceedingly complex but was exceedingly lengthy in the trial itself.

3. The net value of the entire marital estate, giving the parties all benefit of all doubts, does not exceed $125,000.00.  [The Debtor] is a Realtor with the ability to earn income far in excess of what he was earning at trial.  [Ms. Keeton] is a public-school teacher with a gross annual income of approximately $60,000.00.  The largest asset the parties accumulated during their marriage is [Ms. Keeton's] retirement account as a public-school teacher.

4. Custody of the children was litigated, but due to the procedural history of this case, the issue of custody was not difficult for this court to determine based upon the conduct of [the Debtor] regarding the children and the Order of Protection entered between these parties whereby the [Debtor] was determined to have committed domestic abuse against [Ms. Keeton].  That domestic abuse case was appealed and affirmed by the Arkansas Court of Appeals.

5. Pending before this court is [Ms. Keeton's] request for fees and costs totaling $103,563.35.  In over 21 years on the domestic bench, this court has had less than a handful of domestic cases involving a fee request of this size.  In those other cases, the issues were many and complex, and the marital estates involved were significant.  As stated above, that is not the case here.

6. . . . .

11

7.     The fees and costs requested by [Ms. Keeton] are troubling in that they are exorbitant, bordering on unconscionable.  The fees and costs requested exceed [Ms. Keeton's] annual gross salary by 170%. With that being stated, it is also proper to state that [the Debtor] did nothing to lessen the amount of fees and costs expended; and, in fact made this case more difficult than it should have been in several areas of contention.

8.     I have considered the various factors the courts should consider in making an award of fees, as well as those factors set out in appellate decisions regarding fee requests.

9.     I find that an award of fees totaling $50,000.00 plus costs of $10,269.72 should be awarded in this matter.  [Ms. Keeton] is granted judgment against [the Debtor] in the sum of $60,269.72 for attorney fees and costs.

(Debtor's Ex. 6).  Award 3 consists of this $60,269.72 in attorney's fees and costs awarded in connection with the Divorce Action.

### (3)  Award 4 - $7,480.10

After the Decree was entered, the Debtor failed to pay child support and Ms. Keeton filed a fifth motion for contempt in the case, which became the basis for an order to show cause being entered in November 2019.  There was testimony about how the Debtor avoided service of the motion, and eventually a pickup order was issued for failure to pay child support.  On March 21, 2022, Ms. Keeton was awarded a judgment for her attorney's fees and costs incurred in connection with the matter in the amount of $6,797.89 in attorney's fees and $682.21 in costs, for a total award of $7,480.10 ("**Award 4**").  (Creditor's Ex. 5, at 25).  The order awarding the fees stated as follows:

The Court in this matter is very familiar with the history of this case having dealt with many Motions and hearings since 2018.  [Ms. Keeton] filed her fifth Contempt Motion in this matter that was the basis for the Court filing the Order to Appear and Show Cause in November, 2019.  [Ms. Keeton] was forced to spend unnecessary attorney fees and costs just to get service on the [Debtor] because the [Debtor] admitted he was hiding in the house instead of answering the door when the process server showed up and

instructed his staff to deny service of documents. The [Debtor] has admittedly avoided service of the documents in this matter and [Ms. Keeton's] attorney's fees and costs [have] increased dramatically due to the behavior of the [Debtor].

(Creditor's Ex. 5, at 25). The Debtor was ordered to "make monthly payments in the sum of $750.00 to satisfy the judgment for attorney fees and costs, with payments to begin on May 1, 2022." (Creditor's Ex. 5, at 26).

### (4) Award 5 - $2,000.00

Subsequent to the fees and costs being awarded in connection with the fifth contempt motion, Ms. Keeton was awarded $2,000.00 in attorney's fees in connection with the Debtor's failed attempt to obtain an order for protection against Ms. Keeton and her father ("**Award 5**"). There was little testimony concerning the nature of the request for the order of protection. Ms. Gattis testified that the Debtor was "retaliating." (Tr. at 170). According to the order, the petition was heard in September 2019, but the final order on the petition was not entered until three years later. In the order awarding Ms. Keeton attorney's fees, the court stated:

Even though [Ms. Keeton's] counsel has failed to timely forward a final order to the court for entry, and has failed to timely request a hearing on her motion for fees, the court is still mindful of the fact that [the Debtor] failed in his attempt to obtain an Order of Protection against [Ms. Keeton] and [Ms. Keeton] is entitled to her attorney fees and costs in the sum of $2,000.00.

(Creditor's Ex. 5, at 30).

This order granting the fee award was entered on October 4, 2022. Less than one month later, on October 31, 2022, the Debtor received credit counseling, a prerequisite for filing bankruptcy.

13

### B. Bankruptcy Case

On March 30, 2023, the Debtor filed a voluntary petition for relief under the provisions of Chapter 13 of the United States Bankruptcy Code.  In his schedules, the Debtor lists the Office of Child Support Enforcement ("**OCSE**") as an unsecured priority creditor with a claim amount of $4,357.00 described as "Family Support – Arrearages."  (Debtor's Ex. 1, at 19).  The Debtor lists Ms. Keeton as a nonpriority unsecured creditor for "Notice Only" purposes and lists her address as "c/o Tammy Gattis, 1400 Brookwood Drive, Little Rock, AR 72202."  (Debtor's Ex. 1, at 21).  He also lists Ms. Gattis as a nonpriority unsecured creditor with a claim amount of $67,500.00 for "Attorney Fees – Case No. 60DR-18-1532."  (Debtor's Ex. 1, at 23).  The Debtor lists Jerry Armstrong, Sr., his father, as a nonpriority unsecured creditor with a claim of $68,950.00 for "Cash Loans."  (Debtor's Ex. 1, at 22).

Schedule I and J reflect that the Debtor has a negative monthly net income of $1,310.33.  His gross monthly income is listed as $4,419.67 from operating a business.  He lists TAP Real Estate, Inc. ("**TAP**"), as his business in his statement of financial affairs.  His proposed plan of reorganization filed on April 18, 2023, proposes to pay $225.00 per month to the chapter 13 trustee.  The plan proposes a $121.03 monthly payment to OCSE to pay a $4,357.00 child support arrearage.  The plan also proposes to pay the Debtor's bankruptcy attorney $3,168.00 during the plan with any funds remaining to be paid to unsecured creditors *pro rata*.

At the time of the hearing, the Debtor's ongoing monthly child support obligation was $910.00.  The Debtor testified that in January 2024 this amount would increase to $1,237.00 per month, and he pays this directly to OCSE.

On September 14, 2023, the Claim was filed on behalf of Ms. Keeton in the amount of $72,002.11.  Ms. Keeton's Claim is comprised of Awards 1 through 5 awarded to her in the

14

Divorce Action, plus an additional $1,000.00 for "Attorney's Fees." (Creditor's Ex. 5, at 4). The Claim itemizes the fee amounts as follows:

| | | |
|---|---|---|
| 4/3/2019: | $    153.00 | [Award 1] |
| 4/3/2019: | $  1,099.29 | [Award 2] |
| 11/19/2019: | $ 60,269.72 | [Award 3] |
| 3/21/2022: | $  7,480.10 | [Award 4] |
| 10/4/2022: | $  2,000.00 | [Award 5] |
| Attorney's Fees: | $  1,000.00 | |
| **TOTAL:** | **$ 72,002.11** | |

(Creditor's Ex. 5, at 4). At the hearing, both parties called witnesses to testify about the nature of the attorney's fees and costs awarded.

### C. Testimony of Witnesses

The Debtor testified on his own behalf. He explained that he is the sole owner of TAP, an S-Corporation, and he is currently the real estate broker for TAP. His income is largely received from title companies after various real estate transactions, but he also manages some rental properties. Any funds received are deposited into TAP's bank account, and the Debtor is paid from TAP's bank account as its only employee. He also testified that he takes occasional draws from the account for personal expenses.

The Debtor did not dispute that a large part of the four-day final hearing in the Divorce Action was "related to determining what [his] income was" and testified that "[a]lmost the entire trial" was related to determining his income. (Tr. at 29). When asked whether the amount of his "income was needed in order to determine the amount of child support," he responded, "Yes." (Tr. at 70). It was clear from the Debtor's testimony that he did not agree with the state court's

15

decision to impute income to him, nor with the method the state court used when imputing his income.

The Debtor also testified that he did not believe the $60,269.72 award (Award 3) was related to the payment of alimony, insisting that "there was never alimony" awarded in the Divorce Action. (Tr. at 46). He did admit that he was ordered to pay Ms. Keeton's car payment until the note was paid in full, and he was also ordered to pay Ms. Keeton's mortgage payment during the divorce proceedings.

Ms. Gattis testified on behalf of Ms. Keeton. Ms. Gattis has practiced law as a domestic relations attorney for thirty-five years and represented Ms. Keeton in the Divorce Action. Her contract with Ms. Keeton set hourly rates of $275.00 for Ms. Gattis's time and $150.00 for paralegal time. As explained above, Ms. Keeton incurred over $103,000.00 in attorney's fees and costs in the Divorce Action. She paid Ms. Gattis the fees and costs by borrowing money from her parents. It was Ms. Gattis's opinion that all the fees sought in the Claim were in "some way" in the "nature of support." (Tr. at 142).

When asked if the four-day final divorce "hearing was largely testimony and documents and evidence presented to determine what [the Debtor's] income was for child support and alimony purposes," Ms. Gattis responded, "Absolutely." (Tr. at 130). She then added that "about three hours" were spent on custody issues when the court-appointed counselor testified. (Tr. at 130). Ms. Gattis was also asked about property division. She testified that the division of property was not a large consideration in the Divorce Action.

In addition to Awards 1 through 5, the Claim also reflects attorney's fees in the amount of $1,000.00. Ms. Gattis testified on cross-examination that she did not know what these fees represent. On redirect, counsel for Ms. Keeton inquired of Ms. Gattis, "And then, finally, there

is an attorney fee listed of 1,000 dollars, and if I tell you that's our fee, you—you understand that, correct?" (Tr. at 182). Ms. Gattis responded, "Yes. Correct." (Tr. at 183). Prior to this, Ms. Gattis was asked, "And it's your understanding, I'm assuming, that Ms. Keeton paid me a fee to be here today as well?" (Tr. at 182). Ms. Gattis responded, "Oh, okay. I didn't know that, but okay." (Tr. at 182). Ms. Keeton testified that she believes she "should be awarded [her] additional attorney's fees and costs incurred in order to enforce this judgment." (Tr. at 188).

## III. ARGUMENTS

The Debtor argues that the Claim is not a domestic support obligation but is a debt arising from a litigated property settlement agreement and is dischargeable under 11 U.S.C. § 523(a)(15). He primarily alleges that the Claim relates almost entirely to attorney's fees paid to Ms. Keeton's state court attorney "for divorce proceedings, including a division of assets." (Obj., ¶ 9). The Debtor asserts that the fees were voluntarily incurred by Ms. Keeton "at her own expense to over-litigate a routine and non-complex divorce principally based on a division of assets, not child support or alimony." *Id.*

Additionally, he argues that nothing in the Decree or the separate awards of attorney's fees indicates that the fees incurred were necessary for the support or maintenance of Ms. Keeton. *Id.* Counsel for the Debtor asserts that "there [was] not a discussion or a delineation as to how much related to support obligations versus simply a property settlement issue" in the state court judgments for attorney's fees. (Tr. at 7–8). While he admits these issues are "kind of intricately entwined," counsel for the Debtor argues that "because of the commingling and because of the extensive litigation and because of the comments of the state court . . . much of the attorney's fees are overstated, should be reduced, and also do not relate to custody, maintenance, or support." (Tr. at 8, 207–08). He furthers argues that the awards do not qualify

as domestic support obligations "because there was a lot of litigation that determined what the . . . extent of the marital estate was." (Tr. at 208).[4]

Counsel for Ms. Keeton argues that the Claim is a domestic support obligation and did not arise from a property settlement agreement. She asserts that the attorney's fees were incurred to determine the "correct amount of child support and spousal support required to maintain [Ms. Keeton's] and her children's livelihood." (Tr. at 211–12). She argues that the Claim is in the nature of "alimony and support" because the fees were incurred "due to the Debtor's concealment of his income . . . for the purposes of calculating child support and alimony," his failure to obey the state court orders to pay "child support in a timely fashion," and his attempts to hide his assets. (Resp., ¶ 9; Tr. at 10).

Ms. Keeton argues that the extensive litigation was necessary because the Debtor was uncooperative and did not produce the information needed to determine his income. She contends she had to resort to subpoenas and depositions to determine the Debtor's income. Her counsel argued, "There can be no support ordered if the [D]ebtor's income cannot be ascertained in the divorce case." (Tr. at 12, 210). Counsel further argued that "most of the four day trial" was focused on determining the amount of the Debtor's income "to determine how much support he was really supposed to pay." (Tr. at 211).

---

[4] At the end of his closing argument, the Debtor's counsel stated, "[I]t appears that there may be a late filed claim, and to the extent that a claim deadline has been missed, we would, in the alternative, ask for the . . . [Claim] to be deemed disallowed as late filed, or, in the alternative, treated as a wholly unsecured claim." (Tr. at 208–09). These statements appear to be an attempt by the Debtor to raise a new ground for disallowance of the Claim not previously raised at the hearing or in the Objection itself. The Court will not consider the Debtor's statements for several reasons. First, counsel's statements that it "appears" there "may be" a late filed claim were too vague and indefinite to form a formal argument. Second, Ms. Keeton was not afforded sufficient notice of the Debtor's position to be able to present a defense at the hearing. Again, his statements were made for the first time at the end of closing arguments. Finally, case law does not support the Debtor's position. *See In re Lewis*, 227 B.R. 886, 890 (Bankr. W.D. Ark. 1998).

## IV. DISCUSSION

The matter before the Court is an objection to claim.  Under the Bankruptcy Code, a proof of claim is deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  If an objection is filed, the Court is to determine the amount of such claim and must allow the claim unless one of nine enumerated exceptions found in Section 502(b) applies.  11 U.S.C. § 502(b); *see also Sears v. Sears (In re Sears)*, 863 F.3d 973, 977 (8th Cir. 2017).

A properly filed proof of claim constitutes "prima facie evidence of the validity and amount of the claim."  FED. R. BANKR. P. 3001(f).  The objecting party then bears the burden of "going forward with evidence contesting the validity or amount of the claim."  *In re Lepley*, No. 07-20344, 2007 WL 2669128, at *2 (Bankr. W.D. Mo. Sept. 6, 2007) (first citing *Dove-Nation v. eCast Settlement Corp.*, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004); and then citing *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)).  If the objector presents evidence supporting its objection to claim, the ultimate burden of persuasion rests with the claimant to establish the validity of the claim by a preponderance of the evidence.  *Id.; Dove-Nation*, 318 B.R. at 152.

### A.  Domestic Support Obligations – Generally

The Bankruptcy Code defines a "domestic support obligation" in relevant part as a "debt . . . that is owed to . . . a spouse, former spouse, or child of the debtor . . . in the nature of alimony, maintenance, or support . . . of such spouse, former spouse, or child of the debtor . . . established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of a separation agreement, divorce decree, or property settlement agreement [or] an order of a court of record . . . not assigned to a nongovernmental entity."  11 U.S.C. § 101(14A)(A)–(D).

19

Domestic support obligations are nondischargeable in bankruptcy and are entitled to priority treatment.  *See* 11 U.S.C. §§ 523(a)(5), 1328(a), 507(a)(1)(A).  Conversely, debts owed to a spouse, former spouse, or child of the debtor that do not qualify as domestic support obligations are dischargeable in Chapter 13 cases and are not entitled to priority status.  *See* 11 U.S.C. §§ 523(a)(15), 1328(a); *Phegley v. Phegley (In re Phegley)*, 443 B.R. 154, 157 (B.A.P. 8th Cir. 2011).

In the Eighth Circuit, whether a debt is a domestic support obligation or a property settlement is a question of federal law.  *Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1056 (8th Cir. 1983).  "When deciding whether a debt should be characterized as one for support or property settlement, the crucial question is the function the award was intended to serve." *In re Phegley*, 443 B.R. at 157 (first citing *Adams v. Zentz*, 963 F.2d 197, 200 (8th Cir. 1992); then citing *Boyle v. Donovan,* 724 F.2d 681, 683 (8th Cir. 1984); and then citing *Kruger v. Ellis (In re Ellis)*, 149 B.R. 925, 927 (Bankr. E.D. Mo. 1993)).

Courts consider a multitude of factors when determining whether a debt is a domestic support obligation, including:

> the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary; the relative financial conditions of the parties at the time of the divorce; the respective employment histories and prospects for financial support; the fact that one party or another receives the marital property; the periodic nature of the payments; and whether it would be difficult for the former spouse and children to subsist without the payments.

*In re Phegley*, 443 B.R. at 158 (first citing *Morgan v. Woods (In re Woods)*, 309 B.R. 22, 27 (Bankr. W.D. Mo. 2004); then citing *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 608 (B.A.P. 8th Cir. 1997); and then citing *Schurman v. Schurman (In re Schurman)*, 130 B.R. 538, 539 (Bankr. W.D. Mo. 1991)).  "A liberal construction governs the analysis of what constitutes support to

fulfill the legislative purpose of § 523(a)(5)." *Amos v. Carpenter (In re Amos)*, 624 B.R. 657, 660 (B.A.P. 8th Cir. 2021) (citing *In re Phegley*, 443 B.R. at 158 (finding "policy . . . favors the enforcement of familial obligations over a fresh start for the debtor")).

Attorney's fees and costs awarded in connection with divorce proceedings can constitute domestic support obligations if "the award is in the nature of support." *Rump v. Rump (In re Rump)*, 150 B.R. 450, 453 (Bankr. E.D. Mo. 1993) (citing *In re Williams*, 703 F.2d at 1057). Likewise, attorney's fees and costs incurred in litigating child support issues qualify as domestic support obligations if "the obligation is in the nature of support of the child." *Howard v. Sullivan (In re Sullivan)*, 423 B.R. 881, 883 (Bankr. E.D. Mo. 2010) (citing *Holliday v. Kline (In re Kline)*, 65 F.3d 749, 751 (8th Cir. 1995)). In such case, the court must analyze "whether the action which gave rise to the debt has a tangible relationship to the child's welfare." *Id*. (citing *Adams*, 963 F.2d at 199).

### B. Awards 1 through 5

The parties do not dispute that Awards 1 through 5 are debts owed to the Debtor's former spouse, that the awards were established by the Decree or other court order, and that the debts have not been assigned to a nongovernmental entity. *See* 11 U.S.C. § 101(14A)(A), (C)– (D). The parties do dispute whether the awards are in the nature of support as required by Section 101(14A)(B) of the Bankruptcy Code. As discussed above, the facts behind each award are not identical. Therefore, the Court will analyze each award separately.

### *(1) Awards 1 and 2 - $153.00 and $1,099.29, respectively*

In April of 2019, the Arkansas Court of Appeals awarded Ms. Keeton her brief costs in the amount of $153.00 and her attorney's fees and costs in the amount of $1,099.29 in connection with the Debtor's unsuccessful appeal of the order of protection issued against him.

The order of protection barred the Debtor "from the home and workplace of [Ms. Keeton]." (Debtor's Ex. 5, ¶ 7). The order of protection also served as a basis for the state court's decision to award custody of the minor children to Ms. Keeton and award only visitation to the Debtor.

"A majority of courts agree that attorney fee awards related to enforc[ing] or defend[ing] issues involving child support, visitation or custody that effect the welfare of the children do qualify as domestic support obligations." *In re Amos*, 624 B.R. at 662 (citing various cases). Courts have reasoned that "it is in the child's best interests to have custody matters fully and fairly litigated," and that "[i]nsuring this is done is part of the parents' duty to support the child." *Madden v. Staggs (In re Staggs)*, 203 B.R. 712, 718 (Bankr. W.D. Mo. 1996) (quoting *Peters v. Hennenhoeffer (In re Peters)*, 133 B.R. 291, 296 (S.D.N.Y. 1991), *aff'd*, 964 F.2d 166 (2d Cir. 1992)). Further, "[w]here fees have been incurred as a result of continuing litigation involving child custody and support issues, courts have found it is within a parents' duty to ensure custody matters are fully and fairly litigated." *In re Sullivan*, 423 B.R. at 883 (citing *In re Staggs*, 203 B.R. at 718).

Here, both Awards 1 and 2 involve debts that arose from litigation that affected the welfare of the minor children. The order of protection served as a basis for the state court awarding legal and physical custody of the three minor children to Ms. Keeton and granting only visitation to the Debtor. The state court explained, "[T]he issue of custody was not difficult for this court to determine based upon the conduct of [the Debtor] regarding the children and the Order of Protection entered between these parties whereby the [Debtor] was determined to have committed domestic abuse against [Ms. Keeton]." (Debtor's Ex. 6, ¶ 4).

The Debtor appealed the order of protection and Ms. Keeton was forced to defend this ruling, which the Arkansas Court of Appeals ultimately affirmed. The appellate court awarded

22

Ms. Keeton attorney's fees and costs in connection with her successful defense of the appeal. Therefore, the Court finds that the action that gave rise to Awards 1 and 2 had a "tangible relationship to the child[ren]'s welfare." *In re Sullivan*, 423 B.R. at 883.

Accordingly, the Court finds that these awards are in the nature of support and are domestic support obligations.

### (2) Award 3 - $60,269.72

Next, the Court will consider the attorney's fees and costs awarded pursuant to the Decree. On November 19, 2019, upon the filing of a motion by Ms. Keeton's divorce counsel, the state court awarded Ms. Keeton $60,269.72 for attorney's fees and costs that arose from the dissolution of the parties' marriage.

The Debtor argues that this award is not in the nature of support but is a debt arising from litigation primarily concerning the division of property. Specifically, he argues that "much of the attorney's fees . . . do not relate to custody, maintenance, or support . . . because there was a lot of litigation that determined what the . . . extent of the marital estate was." (Tr. at 207–08). Ms. Keeton argues the award is in the nature of support. She asserts the fees were incurred primarily as a result of the Debtor's failure to meet his support obligations as ordered by the state court and his failure to provide reliable information concerning his income, which was relevant to determining the amount of child support the Debtor should pay.

To determine the function the award was intended to serve, the Court will analyze the evidence according to the relevant *Phegley* factors: the language and substance of the agreement in the context of surrounding circumstances; the relative financial conditions of the parties at the time of the divorce; the respective employment histories and prospects for financial support; the

fact that one party or another receives the marital property; and whether it would be difficult for the former spouse and children to subsist without the payments.[5]  Each will be discussed in turn.

### (a)  *The Language and Substance of the Agreement*

The Debtor argues that the state court order awarding attorney's fees and costs does not include a "discussion or a delineation as to how much related to support obligations versus simply a property settlement issue," stating these issues "seem to be kind of intricately entwined." (Tr. at 7–8).  Although the Debtor's counsel referred to Award 3 as a settlement agreement, what is before the Court is the Decree and order granting attorney's fees and costs, not a settlement agreement.

By statute, Arkansas law allows fees and costs to be awarded in domestic relations cases under certain circumstances, including during a divorce action.  ARK. CODE ANN. § 9-12-309 (2020).  In the Decree, the state court gave Ms. Keeton permission to petition the court for an award of attorney's fees and costs.  Neither the Decree nor the subsequent order granting fees and costs specifically labeled Award 3 as being in the nature of support.  Because courts have found that "the labelling of a debt as child support is not dispositive of the issue of whether a debt is dischargeable or not," the inverse can also be presumed.  *In re Peters*, 133 B.R. at 295. The fact that the state court did not designate Award 3 as a type of support is not by itself conclusive.  Therefore, this factor does not weigh in favor of either party.

### (b)  *Relative Financial Conditions*

The next factor to consider is the parties' relative financial conditions at the time of the divorce.  At such time, there was a significant gap in the earning potential between the Debtor and Ms. Keeton.  The Debtor was a realtor, and Ms. Keeton was a public-school teacher.  The

---

[5] *In re Phegley*, 443 B.R. at 158.  The factor regarding the periodic nature of the payments does not apply to the facts of this case.

state court noted that the original request for attorney's fees exceeded Ms. Keeton's income by 170%. The reduced amount granted in Award 3 is nearly equal to Ms. Keeton's annual gross income. If Ms. Keeton were required to pay these fees, she would be deprived of funds necessary for maintaining her and her children's living expenses.

Additionally, the state court explained that the Debtor's conduct during the Divorce Action, as discussed herein, caused added financial hardship for Ms. Keeton and created the need for ongoing litigation. This additional litigation led to higher attorney's fees and costs for Ms. Keeton. The state court, on more than one occasion, pointed out the disparity in the parties' respective incomes in its orders. Therefore, in light of the parties' relative financial conditions, it appears the intent and practical function of the award was not to punish the Debtor or serve as a division of property, but rather to provide the requisite support to Ms. Keeton and the minor children. This factor weighs in favor of Ms. Keeton.

### *(c)* *Employment Histories and Prospects for Financial Support*

The next factor to analyze is the parties' respective employment histories and prospects for financial support. The state court's discussion of the parties' disparate income makes it clear that the court earnestly considered this imbalance in its decision to order the Debtor to pay a portion of Ms. Keeton's attorney's fees and costs. The Decree found that the Debtor possessed far superior earning power than Ms. Keeton, determining that his potential income was twice the amount of Ms. Keeton's annual income.

The Debtor argues that the state court improperly imputed income to him and that he is unable to make the child support payments as ordered. However, these issues are not for this Court to address or even consider. The Eighth Circuit has rejected the use of a "needs test," reasoning that Section 523(a)(5) does not require a "precise inquiry into financial circumstances .

25

. . nor . . . an ongoing assessment of need as circumstances change." *In re Amos*, 624 B.R. at 661 (quoting *Draper v. Draper*, 790 F.2d 52, 54 n.3 (8th Cir. 1986)).

The state court found the Debtor's testimony regarding his income unreliable, and instead imputed income to the Debtor.  To determine the Debtor's imputed income, which was relevant for determining the amount of child support the Debtor should pay, Ms. Keeton had to depose the Debtor's former employers and business associates and investigate his financial accounts through subpoenas.  The fees Ms. Keeton incurred in connection with these efforts related to child support calculations, not the division of the marital estate.  As a result of her efforts, the state court found the Debtor has the ability to earn $120,000.00 per year in gross income, far exceeding Ms. Keeton's gross annual income of approximately $60,000.00.  The state court noted that any reduction in the Debtor's income was due to the Debtor's own conduct.  For all of these reasons, the Court finds this factor weighs in favor of Ms. Keeton.

### (d) Which Party Received Marital Property

The next factor to evaluate is which party received marital property.  The record reflects that while there was some discussion and litigation regarding the marital estate, the marital estate was small and not difficult to divide.  Ms. Keeton received the bulk of the marital property, but as explained by the state court, this was in response to the Debtor's misconduct, which led to multiple motions for contempt and subsequent hearings and orders.  Consequently, the state court awarded Ms. Keeton the Montvale Property, her entire interest in her retirement account, the funds in the Regions Bank joint account, and her 4Runner SUV.  The Debtor was awarded ownership of his 2014 Porsche SUV.

As to the Montvale Property, the state court found that although Ms. Keeton was able to qualify for a mortgage on the property, this did not mean that she could afford the monthly

26

payment while also supporting herself and the three minor children.  The state court found that the Debtor "used his professional knowledge as a realtor to arrange for [Ms. Keeton] to be responsible for a mortgage she cannot afford and then immediately . . . [filed] for divorce." (Creditor's Ex. 3, ¶ 6).  The state court ordered the Debtor to make the monthly mortgage payments on the property during the pendency of the Divorce Action, but he failed to make the payments as ordered.  The Montvale Property was awarded to Ms. Keeton in the Decree because of the Debtor's "contemptible conduct in failing to pay the mortgage as ordered as well as his violation of the restraining order against selling, conveying, or transferring his interest in marital property."  (Debtor's Ex. 5, ¶ 19).

As to the Debtor's unauthorized transfer of marital property, the state court found that the Debtor wrongfully disposed of various items of marital property without court authority and without providing any of the sale proceeds to Ms. Keeton.  The state court awarded Ms. Keeton her entire interest in her retirement account as a result of the Debtor's conduct.  She was also awarded the funds in the Regions Bank account.

As to the 4Runner SUV, the state court awarded Ms. Keeton ownership of the 4Runner and ordered the Debtor to pay off the debt owed on the vehicle as a form of alimony.  While the Debtor contends there was never alimony awarded in the Divorce Action, the Decree explicitly provides that "[t]he payments to be made by [the Debtor] toward satisfaction of the 4Runner debt are in the nature of alimony."  (Debtor's Ex. 5, ¶ 21).  The state court further found that the Debtor "has the ability to pay this debt and [Ms. Keeton] has the need."  *Id.*

In light of the state court's findings regarding which party received the marital property, the Court finds this factor weighs in favor of Ms. Keeton.

(e) *Difficulty Subsisting without the Payments*

The final factor to consider is whether it would be difficult for Ms. Keeton and the children to subsist without payment of Award 3.  As the parent holding physical custody of the minor children, Ms. Keeton bears the heavier financial burden.  As previously mentioned, she earns significantly less income than the Debtor and incurred substantial legal fees litigating matters in the Divorce Action related to the Debtor's refusal to timely meet his support obligations and refusal to provide accurate information regarding his income, which was needed to calculate the proper amount of child support.   While the state court noted the total amount of attorney's fees and costs requested were "exorbitant, bordering on unconscionable," in granting the reduced amount, the state court reasoned that "[the Debtor] did nothing to lessen the amount of fees and costs expended; and, in fact made this case more difficult than it should have been in several areas of contention."  (Debtor's Ex. 6, ¶ 7).

Ms. Keeton's financial burden would be significantly increased without the payment of Award 3, and the increased burden would affect the welfare of the children by placing further strain on her ability to provide the basic necessities for the children.  The Court finds that this factor weighs in favor of Ms. Keeton.

Taken together, the relevant *Phegley* factors weigh in favor of Ms. Keeton, indicating that Award 3 was intended as support for Ms. Keeton and the children.  Contrary to the Debtor's argument, the evidence revealed that the fees Ms. Keeton incurred largely related to either the Debtor's failures to meet his support obligations as ordered by the state court and her subsequent legal actions taken to enforce these responsibilities, or Ms. Keeton's efforts to discover the Debtor's true income for the proper calculation of child support.  Her legal actions related to support issues having a tangible relationship to the children's welfare.

28

For all of these reasons, the Court finds that the practical function of Award 3 was to serve as support for Ms. Keeton and the children.  Accordingly, Award 3 is in the nature of support, and the Court finds it is a domestic support obligation.

### (3)  Award 4 - $7,480.10

The Court will next evaluate whether Award 4 meets the requirements of a domestic support obligation.  On March 21, 2022, the state court awarded Ms. Keeton $7,480.10 in connection with the fifth motion for contempt she filed against the Debtor for his failure to pay child support.  The state court found that Ms. Keeton "was forced to spend unnecessary attorney fees and costs just to get service on [the Debtor]."  (Creditor's Ex. 5, at 25).

This award is in the nature of support, as it directly relates to the children's welfare and stems from litigation related to enforcing issues involving child support.  *See, e.g., In re Sullivan*, 423 B.R. at 883.  The Debtor's failure to timely comply with the order to pay child support has a direct negative impact on Ms. Keeton's ability to provide for the basic needs of their children.  Therefore, the Court finds that Award 4 is a domestic support obligation.

### (4)  Award 5 - $2,000.00

Next, the Court will evaluate whether Award 5 constitutes a domestic support obligation.  On October 4, 2022, the state court awarded Ms. Keeton $2,000.00 in attorney's fees.  The fees were awarded in connection with the Debtor's failed attempt to obtain an order of protection against Ms. Keeton and her father.  There was little testimony about this award other than Ms. Gattis's statements that the Debtor did not have a basis for such an order and that he was "retaliating."  (Tr. at 170).  The record reflects that the state court granted Award 5 to Ms. Keeton because the Debtor "failed in his attempt to obtain an Order of Protection against [Ms. Keeton] and [Ms. Keeton] is entitled to her attorney fees and costs in the sum of $2,000.00." (Creditor's Ex. 5, at 30).

There is insufficient evidence before the Court to support a finding that Award 5 is related to the enforcement or defense of issues involving child support or custody, nor is there sufficient evidence to support a finding that the state court intended this award to serve a support function. Therefore, the Court finds that Award 5 is not a domestic support obligation entitled to priority status in this case.

### C.  $1,000.00 in Additional Fees

In her Claim, Ms. Keeton included an additional $1,000.00 for "Attorney's Fees." (Creditor's Ex. 5, at 4). No itemization or other documentation is attached to the Claim regarding this fee amount. Ms. Gattis testified that she did not recognize this fee. At the hearing, Ms. Rasch, who appeared as bankruptcy counsel for Ms. Keeton, indicated in her questions to Ms. Gattis that the $1,000.00 fee was for services Ms. Rasch had provided to Ms. Keeton. Ms. Rasch also indicated that the $1,000.00 was her fee for appearing at the hearing that day, but no further evidence was introduced.[6]

To qualify as a domestic support obligation, this fee must be a debt owed by the Debtor to Ms. Keeton, in the nature of support, established or subject to establishment by the Decree or other court order, and not assigned to a nongovernmental entity. *See* 11 U.S.C. § 101(14A)(A)– (D). In reviewing the evidence introduced, it is not clear that the $1,000.00 fee meets any of the requirements of a domestic support obligation. The evidence is insufficient to show the fee is a debt owed by the Debtor to Ms. Keeton at all; nothing in the record shows the $1,000.00 fee is a debt *of the Debtor*. In addition, the evidence is insufficient to show that the $1,000.00 fee was

---

[6] Referencing the $1,000.00 fee, Ms. Rasch asked Ms. Gattis, "[I]f I tell you that's our fee, you—you understand that, correct?" (Tr. at 182). Ms. Gattis responded, "Yes.  Correct." (Tr. at 182). Ms. Rasch also asked Ms. Gattis, "And it's your understanding, I'm assuming, that Ms. Keeton paid me a fee to be here today as well?" to which Ms. Gattis responded, "Oh, okay.  I didn't know that, but okay." (Tr. at 182).

established or subject to establishment by the Decree or other court order.  There is no evidence linking this fee to the fees awarded by the state court in the Divorce Action.  Unlike Awards 1 through 5, there was no evidence the Debtor was ordered to pay the $1,000.00 fee or that he was otherwise responsible for future legal expenses incurred by Ms. Keeton.

The evidence is likewise insufficient to show the fee is in the nature of support.  As pointed out by counsel for the Debtor in closing arguments, it is unclear what services were provided in exchange for this fee amount, or exactly when the fee was incurred.  Ms. Rasch did not respond to this argument in rebuttal.  While her questions suggest that Ms. Keeton paid a fee for her appearance at the hearing, the hearing was held over three months after the Claim was filed.  There is no evidence to link the fee to a hearing that had not yet been set, let alone held.  In addition, because there is no itemization or calculation of fees, the Court cannot determine the basis for or reasonableness of the fee amount.  Finally, there is no evidence that the fee has not been assigned to a nongovernmental entity.

 For all of these reasons, the Court cannot find that the $1,000.00 fee is a domestic support obligation owed to Ms. Keeton.  In fact, the evidence failed to prove that Ms. Keeton is entitled to recover the $1,000.00 fee from the Debtor or that the fee is a debt owed by the Debtor at all.  Accordingly, this portion of the Claim must be disallowed.  *See* 11 U.S.C. § 502(b)(1) (providing for disallowance of a claim that is unenforceable against the debtor and property of the debtor).

## V. CONCLUSION

Based on the facts of this case and the evidence presented by the parties, the Debtor's Objection to the Claim is overruled as it pertains to Awards 1, 2, 3, and 4.  The attorney's fees and costs awarded to Ms. Keeton in Awards 1 through 4, totaling $69,002.11, are in the nature of

support and as such are nondischargeable domestic support obligations entitled to priority treatment pursuant to 11 U.S.C. § 507(a)(1)(A).

The Debtor's Objection to the Claim is sustained as it pertains to Award 5 and the additional $1,000.00 fee.  Award 5 was not proven to be in the nature of support, and as a result, is not a domestic support obligation entitled to priority status.  Award 5 in the amount of $2,000.00 should be treated as a general unsecured claim.  As to the additional $1,000.00 fee stated in the Claim, this amount was not proven to be a debt owed by the Debtor and is disallowed.

Accordingly, the Claim is allowed as a priority claim in the amount of $69,002.11, allowed as a general unsecured claim in the amount of $2,000.00, and the remaining $1,000.00 is disallowed.

**IT IS SO ORDERED**.

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  03/18/2024